OSCAR WILLIAMS, JR., Appellant, v. THE STATE OF NEVADA, Respondent.

No. 16921

March 31, 1987                                    734 P.2d 700

*Beury & Schubel,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, and *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Appellant murdered his wife, Toy Williams, by shooting her six times with a handgun. Prior to the shooting, he had obtained a $150,000 insurance policy on her life, in addition to $70,000 in previously existing insurance. Appellant had also attempted to hire an assassin; in the process, he explained precisely how he wanted his wife's murder effectuated.[1]

Although there were no witnesses to the shooting itself, several people arrived at the scene in time to see the gunman flee. One witness saw a shadowy figure standing over Toy's body and pointing a gun at it. Another witness followed that figure down the alley where the shooting occurred, and noted that the man was carrying a bag or purse. Then Richard Priesing, a motorist, saw a man whom he later identified as appellant leave the alley carrying a bag or purse. Appellant was arrested, convicted and sentenced to life imprisonment without possibility of parole. We affirm.

The principal issue on this appeal is whether prosecutorial misconduct necessitates reversal of appellant's conviction. Unfortunately, the prosecutor's conduct was far from ideal. For example, his closing argument included the following:

> She didn't meet him for dinner, did she? That's because Mr. Williams had something else in mind. What he had in mind was not a date for dinner. It was a date for death. Happy Valentine's Day from Oscar to Toy with malice. Cupid uses arrows. Mr. Williams used bullets on February the 12th, 1982.

It is quite clear that "holiday" arguments are inappropriate; they have no purpose other than to arouse the jurors' emotions. Dearman v. State, 93 Nev. 364, 566 P.2d 407 (1977); Moser v. State, 91 Nev. 809, 544 P.2d 424 (1975). The prosecutor also improperly placed the jury in the position of the victim, *see* Jacobs v. State, 101 Nev. 356, 705 P.2d 130 (1985), by stating the following:

> [S]omething caused her to turn back around to where she is shot and discovered in the position where she is found. Perhaps her name or a voice she recognized. In any event, she turned around. Can you imagine what she must have felt when she saw that it was the defendant and he had a gun?

---

[1]The prospective assassin declined the task because of inadequate financial inducement.

110

The prosecutor also used testimony, twice ruled inadmissible, that a policeman thought appellant's chief alibi witness was lying. Worse yet, he contended that appellant purchased the alibi testimony although there was no evidence from which to draw such an inference. A prosecutor may not argue facts or inferences not supported by the evidence. Collier v. State, 101 Nev. 473, 705 P.2d 1126 (1985). Nor may he disparage legitimate defense tactics, Pickworth v. State, 95 Nev. 547, 598 P.2d 626 (1979), but in this case the prosecutor derided impeachment of witness Priesing as a poor reward for a public-spirited citizen. And in violation of a direct admonition from the bench (as well as a rule of professional conduct, see SCR 199 (1985)), the prosecutor made statements to media representatives concerning intended witnesses and proof. We conclude that there was clear and repeated prosecutorial misconduct.[2]

Conduct of this nature implicates many of the rules governing members of the Nevada bar.[3] A prosecutor's primary duty is not to convict, but to see that justice is done. SCR 181(3) (1985). Lawyers (including prosecutors) may not state facts which are not in evidence, or use inflammatory arguments. SCR 195(3), 198(2) (1985). Their conduct should at all times be characterized by honesty, candor and fairness. SCR 198(1) (1985). They must not make statements intended improperly to influence the outcome of a case. SCR 198(4) (1985). And, as previously noted, lawyers are to try their cases in the courts, not in the media. Prosecutorial zeal is both natural and commendable, but it must be confined to well-defined norms in order to convict fairly under the aegis of state authority. Moreover, while prosecutors may "give no quarter" in the presentation of the State's case, they must nevertheless steel themselves against inappropriate conduct stemming from the "heat of battle," the vile nature of the crime or other stimuli. We state the obvious because allegations of prosecutorial misconduct are becoming standard fare in criminal appeals and we are unwilling—indeed, not at liberty—to see the criminal justice system unnecessarily encumbered and extended by inappropriate behavior on behalf of the State. SCR 199 (1985). Accordingly we are constrained to again emphasize that those who violate these rules do so at their peril. SCR 102, 163 (1985).

It does not necessarily follow, however, that the conviction must be reversed. In order to preserve for appellate consideration

---

[2]Appellant alleges several other instances of misconduct, but those allegations lack merit.

[3]In this opinion we shall cite to the rules in effect at the time of trial.

allegations of misconduct in a closing argument, the accused must make a timely objection, obtain a ruling, and request an admonition of counsel and an appropriate instruction to the jury. *Moser, supra.* In the case at bar, this simply was not done. Further, even if appellant had preserved the issue for review, the evidence of his guilt was so overwhelming that the misconduct simply cannot be considered a factor in the outcome of the case. We have noted in the past that we will not reverse where the case is free from doubt. *Id.* And although cases must be tried in the courtroom rather than in the media, the trial court ruled that in this case the jury was not affected by the broadcast which utilized the prosecutor's remarks. Since the misconduct was harmless, it does not justify reversal. NRS 178.598.

Before leaving the issues of misconduct, we desire to dispel any notion that this court views the subject exclusively as a prosecutor's problem. We are not unaware that defense counsel may perceive some incentive for trial misbehavior. If misconduct by defense counsel produces an acquittal, there is no right of appeal by the State; if the misconduct precipitates a basis for review and reversal, defense counsel may still assess the result as positive. In those instances where the prosecutor is convinced that such misconduct is occurring, we strongly urge a timely objection and the making of a specific record outside the presence of the jury. If an appeal is taken in the case, the State may appropriately direct this court's attention to the misconduct by defense counsel for our consideration. Where appeals are not taken, and the magnitude of misconduct by the defense is sufficiently serious, reference should be made to the appropriate disciplinary authority of the state bar with evidentiary support from the record. In brief, the objective is to free Nevada criminal trials from the taint of misconduct, irrespective of the source.

Appellant raises several other issues concerning two of the State's witnesses: Gary Smith, the person whom appellant attempted to hire as an assassin, and Willie Normand, an acquaintance through whom appellant made contact with the prospective killer. The trial court did not err in allowing the two to testify that appellant attempted to hire Smith; since the attempt was unsuccessful, this is not a matter of allowing the State to proceed on dual theories of procuring and actually committing the murder.

Nor did the court err in admitting into evidence clandestine recordings of encounters between appellant, Normand and Smith

after the latter two men had decided to assist the authorities. Recording the conversations did not violate the right to counsel, for appellant was not in custody and had not requested an opportunity to speak with counsel. Escobedo v. Illinois, 378 U.S. 478 (1964).[4]

Further, we cannot conclude that the probative value of the recordings was so slight and the risk of jury confusion so great as to render their admission manifestly erroneous. The tapes were difficult to understand, but they did clearly demonstrate that appellant and the informants shared a secret concerning Toy Williams' death, which appellant wanted Normand and Smith to keep confidential.

Finally, although the court erred in refusing to give a specific jury instruction concerning the credibility of the informants' testimony,[5] the error must be deemed harmless under Buckley v. State, 95 Nev. 602, 600 P.2d 227 (1979). The evidence of guilt was overwhelming, there was a general instruction on credibility, and the informants' character flaws were exposed through cross-examination.

We have examined appellant's many other assignments of error and conclude that they are meritless. Accordingly, we affirm.[6]

---

[4]Appellant also claims the "body-bugging" of these police informants violated Nevada statutes. He is mistaken. Summers v. State, 102 Nev. 195, 718 P.2d 676 (1986).

[5]Such an instruction is favored, Crowe v. State, 84 Nev. 358, 441 P.2d 90 (1968), even though, as in this case, the informants' testimony was corroborated by the tape recordings, by close agreement between the testimony of the two informants, and by the fact that the details of the murder matched specifications given by appellant in his attempt to hire a killer.

[6]This court has previously declared that, as one approach to curbing the problem of attorney misconduct, in appropriate cases we will impose monetary sanctions upon offending counsel. *See, e.g.,* McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984); Moser v. State, 91 Nev. 809, 544 P.2d 424 (1975). We now wish to advise all attorneys of another expedient that may be invoked more frequently hereafter in out efforts to curb offensive professional behavior. In the past, we have been reticent to identify the perpetrators of misconduct by name, primarily out of reluctance to do counsel serious lasting professional injury, *e.g.,* by diminishing their prospects when they may later be considered for judgeships or other public offices. In the future, however, attorneys who cannot conform to the proper norms of professional behavior, whether inside or outside the courtroom, should recognize they are assuming the risk of formal, public censure in our opinions.