*1302 OPINION
By the Court,
Rose, J.:
Christie Ann Rice (Christie) and her husband, Cody Alan Rice (Cody) first met in April of 1990. After learning that she was carrying his child, she moved in with him, and they were subsequently married. However, the marriage was strained because Cody was violent and abusive toward Christie. Matthew, Christie and Cody’s son, was born on July 1, 1992. Sometime around the middle of September 1992, Cody told Christie that Matthew had been accidentally burned in hot water. Christie tried to treat Matthew’s injuries at home. On September 22, 1992, Matthew was rushed to the hospital because he had stopped breathing. He died in the hospital two days later.
Cody was charged with and pleaded guilty to the first degree murder of Matthew. He was sentenced to life imprisonment without the possibility of parole. Christie was charged with child neglect causing substantial bodily harm to Matthew. Following a jury trial, Christie was convicted and sentenced to serve the maximum term in prison allowed by law, twenty years. Christie now appeals. We affirm the conviction but remand for resentenc-ing.

FACTS

In April of 1990, Christie met Cody, and they were engaged in August of 1991. Christie moved in with Cody in January of 1992 *1303 when she found out she was pregnant with Matthew, and the two were married in April of 1992. Christie testified that until she moved in with Cody, the two never had any problems.
Christie stated that shortly after they moved in together, Cody became physically abusive toward her. However, she did not leave because she loved Cody and believed he would not continue to hurt her because he loved her. Christie’s family and friends also testified to Cody’s violent, threatening, and explosive behavior toward Christie.
Matthew was born on July 1, 1992. Despite Cody’s abusive and controlling behavior toward her, Christie testified that she believed he would not hurt Matthew because he was so proud to be a father. Christie testified she could never imagine Cody intentionally hurting Matthew.
On August 21, 1992, Dr. Berkley Powell, a physician in Reno, saw Matthew. Dr. Powell testified that Matthew had a fever, a yellowish, bloody discharge coming from his nose, and was breathing very rapidly. Matthew had also thrown up blood the night before. Matthew was admitted to the hospital and was diagnosed with pneumonia, and he remained in the hospital for approximately a week. During his stay in the hospital, Matthew recovered from the infection but lost almost half a pound.
Dr. Powell also noticed a bruise above Matthew’s nose and his eye. When he asked Christie about it, she said Cody had dropped Matthew, and Matthew’s face had struck a coffee table. Dr. Powell’s concern prompted him to order a CAT scan and X-rays and call child protective services. The X-rays did not reveal any indications of fractures. Dr. Powell testified that Christie seemed uncomfortable with the questions he asked about Matthew’s injuries, and he believed she was covering up for Cody.
Child abuse was suspected, and a social worker from Washoe County Child Protective Services was assigned to Matthew’s case. The social worker testified that Cody related several inconsistent accounts about Matthew’s injuries. Based on twenty-two different factors, the social worker rated the risk of injury to Matthew as low, despite information he received from a family member that Cody had a quick temper.
After Matthew was released from the hospital, Christie got a job because Cody was not working regularly. When Christie was at work, Matthew was in the care of either Cody or Christie’s grandparents. Christie testified that Cody became “very explosive,” volatile, and short-tempered during this time. He quit his job and did not tell Christie. Christie related an incident in which Cody threatened her with a knife, telling her he was going to kill them both so that they would die as a family and nobody could control them any longer. Christie stated that when Cody realized *1304 she was holding Matthew, he backed off. She stated she was terrified of Cody by this point.
On September 17, 1992, Cody went to see Christie while she was at work. He told her Matthew had been burned when Cody had been giving Matthew a bath and failed to check the water temperature. Christie could not remember the exact date this incident had happened. Cody told Christie the burns were not bad, just pinkish. Christie told Cody to go home and stay with Matthew. When Christie got home, she looked at Matthew’s burns. She testified they were “pink like a sunburn” and reddish in some areas. She bathed Matthew, put ointment on his burns, and dressed them in gauze.
Christie told Cody she thought a doctor should see Matthew, but Cody told her no. Cody told her they could treat Matthew’s wounds themselves, and if he got worse, then they would take him to a doctor. Christie acquiesced to Cody’s demands because she was afraid of what Cody would do to her if she did not, especially because Cody had previously threatened to kill them all. Christie was also worried that social services would take Matthew from her.
On September 18, 1992, a friend of Christie’s and Cody’s, Lori Smith, visited Cody and Matthew while Christie was at work. Lori saw Matthew lying on his stomach with gauze covering his back and upper arms. She saw no blisters or oozing around the gauze covered area, but noted that when Cody turned Matthew over to change his diaper, he started crying. She asked Cody what happened, and he told her Matthew had been in the bath when the water suddenly got hot and burned him. Lori thought the burns looked bad, so she asked Cody if Matthew had been to the hospital, and Cody replied that he had.
In the early evening of September 22, 1992, Matthew was having trouble breathing. Christie stated that she told Cody she was going to take Matthew to the doctor the next day, and Cody became enraged. The next day at work, Cody called Christie and told her that there was an emergency with Matthew. When Christie got home, Cody was performing CPR on Matthew. They drove Matthew to the hospital.
Christie and Cody arrived with Matthew at the emergency room of Saint Mary’s Hospital shortly before 5:00 p.m. on September 22, 1992. Shari Quinn, a nurse at the emergency room of Saint Mary’s, testified that when Matthew arrived at the hospital, he had no heart or respiratory rate and was subsequently put on life support. Quinn questioned Christie and Cody about the events leading to Matthew’s injuries. Quinn testified that Christie told her Matthew had been burned four or five days earlier when the water heater had exploded. Quinn re-entered the *1305 emergency room and while moving Matthew, felt fluid from the burn on his back. She stated that when she pulled her hand away from Matthew, her hand had sanguinous fluid and dead skin from the burn on it. She rolled Matthew over and saw a huge burn over most of his back.
Another nurse who treated Matthew assumed when she saw him that he was only four to five weeks old because his weight was so low. Matthew’s injuries included a black eye and a small cut under it, noticeable abrasions on his ear and head, burn marks on his hand, a blister on one of his feet, and a large burn on his back covering the majority of the area between his shoulders and buttocks. The burn on Matthew’s back was open and cracked, moist and oozing, with the skin flaking away. No ointment or other kind of medical treatment was evident on Matthew at the time he was admitted. Additionally, evidence was presented that Matthew had suffered “tissue wasting” and “muscle wasting,” as evidenced by his buttocks and legs having no plumpness and being almost “to bone.”
Matthew was transferred from Saint Mary’s to Washoe Medical Center for further treatment, but died on September 24, 1992. The autopsy revealed that in addition to the burns, Matthew had suffered injuries not superficially apparent. These included broken ribs and a severe cranial trauma. Additionally, Matthew’s thymus gland had withered. The stated cause of death was blunt injuries to the skull and brain, in combination with the burn wound.
Detective Jenkins, a Reno Police detective, was called in by the medical team, and he interviewed Christie. Christie never told him she was afraid of or abused by Cody; however, she did tell Jenkins she had seen Cody very angry on occasions. She also told Jenkins she felt the need to protect her husband and her child and said she had never seen Cody hurt Matthew. Jenkins concluded that Christie, three years older than Cody, was clearly the more mature one and did not seem intimidated by him. In fact, Christie stated that she would leave Cody immediately if he was physically abusive to Matthew or her.
Christie also told Jenkins that Matthew had been burned in the shower with Cody. However, detectives found that the various faucets in Cody’s and Christie’s apartment maintained a consistent temperature, not over 135 degrees. Additionally, testimony was presented which indicated Matthew would have had to have been immersed in water that temperature for nearly one minute to suffer the burns found on him.
Christie initially characterized Matthew’s burns as pinkish in color with no blistering or other indication of a severe burn. Later in the interview, she told Jenkins that Matthew’s blanket was *1306 sticking to his burns and that when she removed the blanket, portions of his skin would “literally peel off with the blanket.” She also indicated that the blistering had occurred shortly after the burn trauma.
Following the investigation of Matthew’s death, Cody was charged with first degree murder. Prior to trial, Cody pleaded guilty to this charge and was sentenced to life without the possibility of parole. On October 28, 1992, an indictment was filed alleging that Christie had committed the offense of child neglect causing substantial bodily harm. The State alleged that Christie had caused Matthew to suffer unjustifiable physical pain when she “neglected, delayed or refused to seek appropriate medical treatment for [Matthew’s] malnourishment and failure to thrive and for second degree burns [Matthew] received while under the care of [Christie] and/or CODY A. RICE.” The State’s theory was that Christie did not seek treatment for Matthew’s burns because she was afraid social services would take Matthew away from her. Christie was only charged with neglecting Matthew for the period between September 14 and September 22, 1992.
Prior to trial, Christie was evaluated by Dr. Lon Kepit, a clinical psychologist specializing in cases involving battered women. Kepit concluded that Christie’s behavior fit the model of a battered woman. Dr. Kepit testified that as a battered woman, Christie would lose sight of her personal boundaries. She would also, therefore, lose sight of boundaries for Matthew and be unable to assess danger accurately.
Following a jury trial, Christie was convicted of child neglect causing substantial bodily harm. The district court sentenced Christie to twenty years in prison.

DISCUSSION

The district court properly instructed the jury concerning the definition of “willfully ” as used in NRS 200.508

In Childers v. State, 100 Nev. 280, 680 P.2d 598 (1984), we considered the propriety of giving an instruction defining the word “willfully” as was given in this case.[1] We concluded that the definition was proper to describe the intent needed for the general intent crime of child abuse/neglect.
*1307 The instruction was proper. The child abuse statute is a general intent crime. The word “willfully” must be defined in that context. The California courts have long approved the use of this definition of “willfully,” which is taken from the California Penal Code Section 7(1). See, e.g., People v. Atkins, 125 Cal. Rptr. 855, 861 (Cal. App. 1975) (approves use under child abuse statute, California Penal Code Section 273d).
(Footnote omitted.) In Smith v. State, 112 Nev. 1269, 927 P.2d 14 (1996), we recently upheld a child abuse and neglect conviction based on NRS 200.508 and held that this statute was not unconstitutionally vague. Child neglect is a general intent crime, and the definition of “willfully” has been approved several times in Nevada and elsewhere. We find no error in its use in this case.

The evidence adduced at trial was sufficient to sustain the conviction

For this court to affirm a conviction, sufficient evidence must be presented to establish the essential elements of each offense beyond a reasonable doubt as determined by a rational trier of fact. Sanders v. State, 110 Nev. 434, 436, 874 P.2d 1239, 1240 (1994). The Ninth Circuit Court of Appeals has stated what evidence is needed to prove child abuse based on delay in seeking medical treatment, and the analysis would be the same for child neglect. Martineau v. Angelone, 25 F.3d 734 (9th Cir. 1994). Martineau states:
Appellants contend, and the state concedes, that under the Nevada Supreme Court’s ruling, the child abuse conviction can be upheld only if the state proved beyond a reasonable doubt that appellants committed an “omission” — i.e. that they “willfully caused or permitted” [the child] to suffer unjustifiable physical pain by delaying in seeking medical care. NRS 200.508 (1977). Appellants argue that even “reviewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found proof of [delay] beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319 (1979). We agree.
In order to prove child abuse based on delay, the state had to prove both (A) that some time passed between [the child’s] injuries and appellants’ 911 call and attempted CPR and (B) that, during this time, appellants knew (or should have known) that [the child’s] injuries were serious enough to require immediate medical attention, yet did nothing.
*1308 Id. at 739 (citing Fabritz v. Traurig, 583 F.2d 697 (4th Cir. 1978)).
Christie’s defense was that when she noticed the burns, she was going to take the infant to the hospital until Cody objected and said that social services would be called and would take the child from them. Concerned about losing her child and Cody’s propensity for violence, she decided that medical assistance was not essential and that she could care for the baby at home. The dissent claims, that at the worst, Christie is guilty of “bad judgment.” However, there is ample evidence from which a jury could conclude that there were observable injuries during the week prior to Matthew’s hospitalization that needed medical attention and that the child suffered substantial pain and injury because of the delay in obtaining such care.
Dr. Ellen Clark, the pathologist who observed the child at the hospital for one and one-half days prior to his death and who conducted the autopsy, stated: “It’s my opinion that Matthew Rice was a victim of child abuse which extended over several episodes, certainly from August through his death.” Dr. Clark testified that the child lost a substantial amount of weight from his first hospitalization on August 22 until his second hospitalization on September 22, and that it was readily observable that he was malnourished and extremely underweight. She explained that his weight at the August hospitalization was in the ten to twenty-five percentile of children two months old, but that when he was admitted on September 22, his weight was below the fifth percentile of children three months old. She did acknowledge that some weight loss could have been attributable to the continuing pneumonia Matthew had that caused the August hospitalization.
Dr. Clark testified that the child had second degree burns from his neck down to the upper part of his buttocks and stated that: “A second degree burn goes deeper into the skin and is characterized by damage to the skin. It’s in the form of blistering, and very often skin sloughage or peeling of the skin.” The burns involved approximately twenty-five to thirty percent of the total body surface area, and Dr. Clark stated that burns over this extent of an infant’s body are extremely serious and cause a great risk of dehydration and infection without proper medical treatment. Another complication of the burn was that it would be a painful injury, and “it would have disturbed the baby’s normal daily functions, including sleeping and eating.”
Christie testified that the burn wound was just pinkish for the four or five days Matthew was at home. While she wanted to take the infant to the hospital, she discerned no emergency medical situation. However, this was refuted by several health profession- *1309 ais and Lori Smith, the couple’s teenage friend. Nurse Quinn testified that upon admission, Matthew’s burn wounds were open and secreting sanguinous fluid. Drs. Clark and Bonaldi testified that the blistering would have been observable shortly after the injury and that immediate medical assistance should have been sought. Describing how the second degree burn wound would look during the four days after the injury, Dr. Bonaldi stated:
[T]he first day would be very red, lots of blisters. Blisters would begin to rupture the first couple, three days. Then depending on how the burn is treated, those blisters will stick to the skin and further weep. If the blisters are removed this would begin some type of granulation or healing phase by three to four days.
Christie admitted that the blistering occurred shortly after the burn and that the blanket was sticking to Matthew’s open wounds. Lori Smith stated that the burns looked bad shortly after they had been sustained. When she inquired about seeking medical treatment, Cody lied about having taken the baby to the hospital.
The jury easily could have concluded that from the time the baby was burned four or five days prior to the hospital admission, he was in desperate need of medical assistance for the serious burns and what Dr. Clark described upon admission as his severe malnutrition and “wasted appearance.” Not only could the jurors conclude, from the expert testimony and their own life experiences, that these physical injuries necessitated immediate medical care, but that the pain and disruption in the infant’s eating and sleeping habits could not have been overlooked by any reasonable person. As to Christie’s assertion that she was afraid of Cody and the possible loss of her child if medical assistance was sought, the jury could have discounted this testimony or believed that Christie has an overriding responsibility to the infant in spite of these possible consequences.
There was more than ample evidence to establish that Christie knew or should have known that the infant was in need of medical care, that she unreasonably delayed in providing it to him, and that the delay caused the infant to suffer unjustifiable physical pain or mental suffering. Therefore, the evidentiary concerns of the Martineau decision were met.

The district court did not err in failing to instruct the jury on the lesser degree of child neglect

NRS 200.508 provides that anyone who willfully causes a child to suffer unjustifiable physical pain or mental suffering as a *1310 result of abuse or neglect is guilty of a gross misdemeanor. But if substantial bodily or mental harm results, the perpetrator is guilty of a felony. The statutory definition of substantial bodily harm set forth in NRS 0.060 states that it is bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or prolonged physical pain.
The indictment charged Christie with causing Matthew to suffer unjustifiable physical and/or mental suffering resulting in substantial bodily harm to the child, a felony. At the trial’s conclusion, the jury was instructed on the felony charge, but the lesser included offense of gross misdemeanor child neglect was not included in the instructions nor was it requested by the defense. Christie now claims that the district judge had an obligation to instruct the jury on the lesser included offense notwithstanding her failure to request such an instruction.
In Davis v. State, 110 Nev. 1114, 881 P.2d 657 (1994), we held that a district court need not instruct the jury on a lesser included offense if evidence clearly showed guilt above the lesser offense. In this case, we believe the State introduced sufficient evidence to establish that Christie’s four or five day delay in seeking medical treatment resulted in Matthew sustaining prolonged physical pain, thereby falling within the definition of substantial bodily harm. Expert testimony established that the massive burn was extremely painful and a jury could conclude that delaying treatment for four or five days unjustifiably prolonged that pain. Therefore, it was not error to omit giving an instruction on the lesser included offense of gross misdemeanor child neglect.

The district court did not err in permitting evidence of the cause of Matthew’s death and then instructing the jury on the limited use of this evidence

Christie argues the State improperly introduced evidence of the cause of Matthew’s death. Prior to trial, the defense filed a motion in limine seeking exclusion of evidence concerning Matthew’s cause of death and injuries that became evident to medical personnel following his admission to the hospital. The defense requested this motion in limine because it was concerned about the prejudice to Christie if evidence was admitted regarding the non-visible injuries as contributing factors to Matthew’s death. The defense claimed Christie would essentially be forced to defend herself against allegations of murder, when she was only charged with neglect, based on her knowledge of the bruising on Matthew’s face upon his admission to the hospital for pneumonia and his burns days prior to his death.
*1311 In a pre-trial ruling, the district judge decided to limit testimony regarding the extent of Matthew’s injuries, beyond those specifically referred to in the indictment, the failure to thrive and the second degree burns. The district judge then decided to admit evidence of the cause of Matthew’s death only after the State’s expert witness, Dr. Clark, testified at length on the subject outside the jury’s presence. Judge Adams noted that the court would give strong cautionary instructions to the jury to the effect that Christie was not on trial for the acts Cody committed on Matthew.
A pretrial order granting a motion in limine may be modified or reversed at trial. To preserve the issue for appeal, however, the objection must be renewed at trial when the evidence previously ruled inadmissible by the order in limine is offered in evidence. Staude v. State, 112 Nev. 1, 5, 908 P.2d 1373, 1376 (1996). During its opening argument, the State made comments regarding Matthew’s injuries discovered by medical personnel upon Matthew’s admission to the hospital. However, the defense did not object to these statements. Therefore, the defense waived its right to complain about these comments on appeal.
On the second day of trial, the district court held a hearing outside the presence of the jury to determine what parts of Dr. Clark’s testimony would be admitted. The district court allowed Dr. Clark to testify to the full extent of the injuries she observed on Matthew during the two days she treated him prior to his being removed from life support. This included the blistered second degree burns and cranial injuries. Prior to Dr. Clark’s testimony, the district judge admonished the jury that Christie was not “charged with causing the death of Matthew . . ., nor . . . with administering any of the injuries which Dr. Clark will discuss in her testimony.” At this point, the defense neither objected to this instruction nor proposed an alternative instruction.
Generally, the failure of a party to propose a limiting instruction bars raising this issue on appeal. Richardson v. State, 91 Nev. 266, 534 P.2d 913 (1975). In Levi v. State, 95 Nev. 746, 749, 602 P.2d 189, 190-91 (1979), this court stated:
Only in exceptional circumstances need the trial court, sua sponte, give such a limiting instruction. For example, in Champion v. State, 87 Nev. 542, 490 P.2d 1056 (1971), the state conceded that a cautionary instruction concerning an addict-informer’s testimony was central to the cause, and we found prejudice where no such instruction was given.
*1312 In this case, the district court provided the jury with a cautionary instruction with no objection by the defense. Therefore, we conclude the district court did not commit error in instructing the jury as it did.

The prosecutor did not engage in misconduct

District courts have a duty to ensure an accused receives a fair trial and must therefore control obvious prosecutorial misconduct sua sponte. Collier v. State, 101 Nev. 473, 477, 705 P.2d 1126, 1128 (1985). “A prosecutor may not argue facts or inferences not supported by the evidence.” Williams v. State, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987).
Christie alleges the prosecutor committed several instances of misconduct in his opening and closing argument to the jury. In his opening argument, the prosecutor stated:
Ms. Quinn went to pick up the infant, who was clad in only a diaper, she placed one hand under his head and the other hand under his lower back. Ladies and gentleman, at that time, even with all her years of experience as a nurse, she felt something so unusual that she had never felt before. She immediately withdrew her hand, and on her hand was skin from infant Matthew Rice because of burns on his back that were so severe, the skin was literally just coming off.
She actually became traumatized herself from this. She went and she washed her hands. She just kept rubbing and rubbing and washing and washing, because it disgusted her so much.
Christie asserts this statement constituted misconduct because Ms. Quinn never testified that she reacted in such a manner to Matthew’s burns. At trial, Quinn testified she was “extremely shocked” and “stunned.” After showing the doctor Matthew’s burned back, she “stepped back out of the picture . . . and just basically got [her] thoughts together.”
Generally, the prosecution has a duty to refrain from making statements in opening arguments that cannot be proved at trial. Riley v. State, 107 Nev. 205, 212, 808 P.2d 551, 555 (1991). “It is proper for the prosecutor to outline his theory of the case and to propose those facts he intends to prove.” Garner v. State, 78 Nev. 366, 371, 374 P.2d 525, 528 (1962). Even if the prosecutor overstates in his opening statement what he is later able to prove at trial, misconduct does not lie unless the prosecutor makes *1313 these statements in bad faith. Id. Although Quinn’s testimony at trial was not exactly what the State promised, nothing in the record indicates the State’s statements were made in bad faith.
In his closing argument to the jury, the prosecutor stated: “Christie Rice, at the age of 22, chose to bring a life, to bring a child into this world. A healthy, beautiful little boy named Matthew was born on July 1st, 1992. ‘Matthew’ means a gift from the Lord.” The defense objection to the relevancy of this statement was overruled.
The prosecutor also stated in closing that:
Anybody who has even scorched themselves with the tip of an iron on your finger or your hand knows the extent of the pain of a burn over several days.
When the life, not just the pain from the burn but the life of an innocent, defenseless child is at stake, is it even conceivable that the mother of that child would neglect that child’s life-threatening injuries because of anything the husband could possibly be threatening her with?
Are we willing to accept this as a defense for the failure to protect such a child? ....
And, ladies and gentleman, of course it goes almost without saying that if your baby is suffering from life-threatening dehydration or the possibility of infection, that you must take all steps to prevent not only that from occurring, but that from getting worse. To knowingly permit any of these risks is unconscionable. . . .
Christie also objects to a later statement in the prosecution’s argument: “No one of us or anyone we can think of would have acted the same and expected their conduct to be excused, to allow this child to suffer.” At that point, the defense objected because the prosecution was misstating the law. The court reminded the jury that the statements of the prosecutor were not statements of law but merely argument.
In Williams v. State, 103 Nev. 106, 109, 734 P.2d 700, 702 (1987), this court concluded that it is improper for the prosecutor to place the jury in the position of the victim. However, in this case, the prosecutor was asking the jurors what they would do if placed in the defendant’s position — not the victim’s. Since the defendant’s state of mind and action were the primary issue and the statements had substantial support in the evidence presented, this argument was not improper and did not prejudice the overall fairness of the trial.
*1314 Finally, Christie objects to the prosecution’s statement to the jury that: “Concededly, the State has not opted to attempt to prove that [Christie] committed any of the abuse by direct physical action, but she is guilty of neglect of this child.” Christie complains that this argument “clearly implied that the state could have charged Christie with actually directly abusing Matthew, but chose not to.” We conclude the defense’s interpretation of this statement is extreme. Christie suffered no prejudice as a result of the statement, and any possible error that resulted was harmless. Ross v. State, 106 Nev. 924, 928, 803 P.2d 1104, 1106 (1990). The argument was relevant to explain what the State had charged and was obligated to prove.

The district court erroneously sentenced appellant by relying on impermissible evidence

The defense called Nancy Clark, a professional who provided an alternate sentencing report based on interviews with people involved in the case. The district judge asked Clark approximately 100 questions, many of which concerned information the judge obtained from presiding over the criminal proceedings involving Cody Rice or from reading Cody’s presentence report. Christie asserts this conduct indicates that in sentencing Christie, the district court judge improperly relied upon information never provided to the defense. In particular, Christie complains about the district judge’s professed disbelief that Christie was unaware of Cody’s drug and alcohol abuse.
NRS 176.156(1) governs the disclosure of presentence reports and states: “The court shall disclose to the district attorney, the counsel for the defendant and the defendant the factual content of the report of the presentence investigation and the recommendations of the division and afford an opportunity to each party to object to factual errors and comment on the recommendations.” In Shields v. State, 97 Nev. 472, 634 P.2d 468 (1981), this court concluded that the trial court’s failure to provide the defense counsel with police reports which were contained in the presen-tence report violated NRS 176.156 and deprived the defendant of due process. This due process violation was highlighted by the fact that “the district judge’s sentencing decision manifestly was affected by information contained in the reports.” Id. at 473, 634 P.2d at 469.
In this case, the district judge spent quite a bit of time questioning Clark about the credibility of Christie’s professed unawareness of Cody’s drug and alcohol use. In his questioning of Ms. Clark, it was apparent that the judge was relying on the informa *1315 tion furnished by Cody in his presentencing report and sentencing hearing. Repeatedly, the district judge asked how Christie could not have known of Cody’s alcohol and drug abuse when Cody’s habit and conduct as described by him would have been obvious to anyone. In effect, the judge was accepting Cody’s statements of continual and excessive drug use as true and asking Clark to square Christie’s professed lack of knowledge of Cody’s drug problem with such statements. This was part of the larger inquiry the district judge was making about whether Christie had lied when she testified.
A judge should always disclose information he has received from third parties concerning the sentencing of a defendant. Todd v. State, 113 Nev. 18, 931 P.2d 721 (1997). And if it appears from the record that the judge used such material or relied on it, the use of the information is deemed prejudicial if not divulged to the defendant. Id. at 26, 931 P.2d at 726; see also U.S. v. Copeland, 902 F.2d 1046 (2d Cir. 1990) (defendant entitled to opportunity to respond to information considered by sentencing court); U.S. v. DeVore, 839 F.2d 1330 (8th Cir. 1988) (court permitted defendant to review co-defendant’s presentence investigation containing co-defendant’s version of the robbery). There is no evidence in the record that the defense was provided with a copy of Cody’s presentence report or that Christie’s attorney stipulated to its use at Christie’s sentencing.
The district judge’s perception of Christie’s veracity was critical. Christie called numerous witnesses at the sentencing hearing who portrayed her as a responsible young adult who had no prior criminal record of any type and would almost certainly do well on probation. The district judge admitted as much.
I don’t doubt a word of what all your friends and relatives and employers have said about you. By every single account from every source, you are a positive, productive, intelligent, able person. You’re a person with good judgment. You’re extremely industrious.
In striking contrast to most of the defendants who come before the Court, you don’t have any history of drug abuse, alcohol abuse, unemployment. You have a record every parent would hope for their child: an A student, a good employee, a participant in a program for gifted and talented students, a manager of other employees at a young age. In short, a model life.
In viewing Christie’s positive life before the birth of her child and the criminal neglect of which she was convicted, the district judge posed the following two extremes: “Either she shouldn’t be *1316 in prison or [on] probation, just congratulate her for being a nice person and go home, or she should be punished very severely.” The judge later speculated that perhaps Christie knowingly let her child be severely abused by Cody to “take [the child] out of the picture” and remove the “obstacle to the flourishing of her life with her husband.” The judge’s opinion of Christie’s credibility did in large measure determine whether she received the lightest or the most severe sentence.
In accepting Cody’s statements in the presentence report and using them in a critical analysis of whether Christie had fabricated her testimony, the judge apparently came to the conclusion that Christie had lied and that she was partly responsible for the child’s death. Cody’s presentence report was just as important to Christie as was the police report in the Shields case, and perhaps more so. The prosecutor even referred to Cody’s presentence report in his closing argument. Therefore, we believe that since the district court’s use and reliance upon Cody’s presentence report without providing the defense with a copy constituted prejudicial error, we are compelled to reverse the sentence in this case and remand for resentencing. To eliminate any problem with what the sentencing judge may remember from the sentencing of Cody, the resentencing shall be conducted by another district court judge. Since we conclude that the use of Cody’s presen-tence report requires us to reverse this sentence, it is not necessary to consider Christie’s remaining claims of error committed at sentencing.

CONCLUSION

First, we conclude that sufficient evidence existed to sustain Christie’s conviction for felony child neglect. Second, we conclude that because Christie failed to request an instruction on the lesser offense of gross misdemeanor child neglect, the district court did not err in failing sua sponte to instruct the jury on this lesser offense. Third, we conclude that the use of evidence of the cause of Matthew’s death was properly restricted by the instruction given to the jury. Fourth, the prosecutor did not engage in misconduct in the opening and closing arguments. However, we also conclude that the district court relied on impermissible evidence in sentencing Christie. Accordingly, we affirm the conviction of child neglect, but reverse the sentence imposed and remand to the district court for sentencing by another district judge.[2]
Shearing, C. J., and Young, J, concur.

 The following is the instruction given to the jury:
The word “willfully,” when applied to the intent with which an act is done or omitted, as used in my instructions, implies simply a purpose or willingness to commit the act or to make the omission in question. The word does not require in its meaning any intent to violate the law, or injure another.

 The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.