OPINION
By the Court,
Hardesty, J.:
Appellant Donte Johnson was convicted by a jury in 2000 of four counts of first-degree murder with the use of a deadly weapon, among other crimes, and was sentenced to death by a three-judge panel. On direct appeal, this court affirmed his conviction, but vacated his death sentence and remanded for a new penalty hearing because the three-judge sentencing procedure violated the United States Supreme Court’s holding in Ring v. Arizona.[1]
Johnson’s new penalty hearing began in April 2005 before a jury and was bifurcated into separate phases: a death-eligibility phase and a selection phase. The jury sentenced Johnson to death. He appeals.
Among the issues on appeal is whether the Confrontation Clause of the Sixth Amendment to the United States Constitution and the Supreme Court’s holding in Crawford v. Washington[2] apply to the selection phase of a bifurcated capital penalty hearing. Applying our holding in Summers v. State,[3], we conclude they do not. Neither this issue nor the others Johnson raises warrant reversal. Therefore, we affirm.

FACTS

The facts underlying Johnson’s conviction are set forth in detail in this court’s 2002 opinion.[4] In this opinion, we recount only those facts necessary to an understanding of the issues presented.
On the night of August 13 or early morning of August 14, 1998, Johnson (whose real name is John White), along with two other men, entered a Las Vegas home intending to commit robbery. While inside, Johnson murdered 20-year-olds Tracey Gorringe and Matthew Mowen, 19-year-old Jeffery Biddle, and 17-year-old Peter Talamantez by binding them with duct tape and shooting them execution-style in the head. Stolen during the robbery were a VCR, a video game, a personal beeper, a set of keys, and about $200 in cash.
*1348 Johnson was arrested four days later and charged with four counts of first-degree murder with the use of a deadly weapon, four counts of first-degree kidnapping, four counts of robbery with the use of a deadly weapon, and one count of burglary while in possession of a firearm. In 2000, a jury convicted him of all charges but could not agree during his penalty hearing on what sentence to impose. Another penalty hearing was later held before a three-judge panel, which sentenced Johnson to death for each of the four murders.
This court affirmed Johnson’s conviction in 2002.[5] But the fact that Johnson was sentenced to death based on findings by a three-judge panel, instead of a jury, violated the Supreme Court’s holding in Ring.[6] His death sentence was therefore vacated and his case remanded to the district court for a new penalty hearing.[7]
Johnson’s new penalty hearing — his third — began in April 2005 before a jury. The district court granted Johnson’s pretrial motion to bifurcate it into separate phases: death-eligibility and selection.
I. Death-eligibility phase
Johnson’s death-eligibility phase lasted four days. Both parties made opening statements to the jury.

State’s case in aggravation

The State presented evidence of a single aggravating circumstance it pursued for each of the four murders — that Johnson had been convicted of more than one murder in the immediate proceeding pursuant to NRS 200.033(12).[8]
Certified copies of the jury verdict forms and transcripts from the original guilt phase were admitted into evidence to establish the quadruple murder by Johnson. The State also presented the testimony of four witnesses. Justin Perkins, a friend of the victims, testified how he discovered their lifeless bodies. Las Vegas Metropolitan Police Department (LVMPD) Detective Thomas Thowsen, who had investigated the four murders since they were first reported in August 1998, gave the bulk of the testimony. He recounted for the jury the criminal investigation and summarized evidence presented through various State witnesses during the guilt phase. He also read portions of the original trial testimony of these witnesses. LVMPD Forensic Crime Lab Manager Berch Henry testified about the DNA analysis linking Johnson to the *1349 murders, and Clark County Forensic Pathologist, Medical Examiner Dr. Gary Telgenhoff, summarized the autopsy findings regarding each victim.
Each of the victims, according to Dr. Telgenhoff, died from a single gunshot wound to the back of the head at “very close” range — “about an inch or so away from skin.” The wrists and ankles of each victim were bound with duct tape, and none had any “defensive wounds.” Unlike the other victims, Talamantez also had a laceration and abrasion on his nose “due to blunt force” consistent with being “pistol whipped.”

Defense’s case in mitigation

Johnson called only members of his family to testify during this phase. They testified that Johnson’s mother, who by her own admission was “a little slow,” abused alcohol and illegal drugs, including crack cocaine and PCP, when Johnson was a child. She even did so in his presence. She would sometimes leave Johnson and his sisters alone or lock them in a closet. Johnson’s father abused his mother in front of Johnson and his sisters, once knocking her teeth out and attempting to throw her out of a hotel window. Johnson was also beaten.
At one point, Johnson, his two sisters, and several of his cousins were forced to live in a one-room shed for about a month. The shed had no running water, no carpet, and no furniture. The children had to go to the bathroom in a bucket and sleep on the floor with no covers. While living in the shed, the children sometimes did not comb their hair or eat. Because they had no shower, the children often had to go to school with body odor. They were also hungry at times.
The police were eventually contacted, and the children, including Johnson, were taken into foster care. Johnson and his sisters were thereafter sent to live with their grandmother, who was also caring for about ten other children. Johnson’s grandfather, according to Johnson’s sister Johnnisha Zamora, did the best he could, but she could not recall any time he ever spent with Johnson.
Johnson’s grandmother’s house was in the Compton area of Los Angeles, where, as Johnson’s sister Johnnisha explained, there was “a lot of violence.” Johnson and his two sisters were often chased and beaten up at school. His sister Eunisha White testified that Johnson was short and that they were “picked on a lot by different people for no reason.’ ’
Johnson’s family testified about the positive aspects of his personality and their love for him. A video and several family pictures were admitted into evidence. Johnson’s eight-year-old son Allen White, who was in the third grade, read to the jury a letter he wrote to his father which stated in part: ‘ T will love you in my heart, and you will love me in mine.’ ’

*1350
Special verdict

The State and the defense made closing arguments, and the State argued in rebuttal. The jury was also given instructions. The jury returned four special verdicts, finding the single aggravating circumstance pursued by the State. Seven mitigating circumstances were found: Johnson’s youth at the time of the murders (he was 19 years old); he was taken as a child from his mother due to her neglect and placed in foster care; he had “no positive or meaningful contact” with either parent; he had no positive male role models; he grew up in violent neighborhoods; he witnessed many violent acts as a child; and while a teenager he attended schools where violence was common.
The jury found the aggravating circumstance outweighed the mitigating circumstances and that Johnson was eligible for death.
II. Selection phase
The selection phase in Johnson’s case lasted five days. Both the State and the defense made new opening statements to the jury.

State’s case in support of a death sentence

Evidence regarding Johnson’s prior bad acts was admitted during this phase of the hearing.
A Los Angeles Police Department lieutenant and a bank manager testified regarding Johnson’s participation in an armed bank robbery in 1993, when he was about 15 years old. An LVMPD officer testified that in 1998 Johnson was implicated in the shooting of a man in Las Vegas. That man later died. The district court admitted documents into evidence charging Johnson with attempted murder and battery with the use of a deadly weapon relating to the incident, as well as Johnson’s guilty plea and judgment of conviction for the battery charge.
California Department of Corrections Parole Division officer testified about Johnson’s juvenile record in California. The district court admitted Johnson’s judgment of conviction for the 1993 armed bank robbery into evidence, showing that he was sentenced to four years in the California Youth Authority (CYA) program. Johnson was paroled from the CYA program prior to the expiration of his four-year sentence, but he later absconded from parole.
LVMPD Officer Alexander Gonzalez testified that he worked at the Clark County Detention Center in February 2001 in the unit housing high-risk inmates. He described a fight between Johnson and another inmate, Oscar Mas. With help from a third inmate, Johnson threw Irias over a second-tier railing. Mas survived.
LVMPD Detective James Buczek participated in the quadruple murder investigation. He testified on behalf of Nevada Highway Patrolman Sergeant Robert Honea (who had testified in Johnson’s 1998 trial). According to Detective Buczek, Sergeant Honea *1351 conducted a traffic stop involving Johnson on August 17, 1998, three days after the murders. Johnson was the driver, but identified himself as “Donte Fleck”; a passenger in the car was one of his accomplices in the robbery and murders. During the stop, Johnson and his passenger abandoned the car and fled on foot. A rifle loaded with 20 rounds of ammunition was located in the car, along with a clip of ammunition.
In addition to the prior bad act evidence, the State also admitted impact testimony from the families of Johnson’s four victims.
Juanita Aguilar, the mother of Peter Talamantez, testified that Peter “was very smart, very caring. He could have done just about anything he wanted to, but at 17, you don’t really think too much about what you want to be in the future because you’re still out having fun.” Peter’s murder had caused her severe depression. She lamented: “There’s not one day I don’t think about my baby.”
Marie Biddle, the mother of Jeffery Biddle, testified that Jeffery liked to play sports, he was a “wonderful artist,” and someday he either wanted to go into law enforcement or the Air Force. She told the jury that Jeffery’s murder had “been very devastating.”
Sandy Viau, the mother of Tracey Gorringe, testified that Tracey wanted to become an electrical engineer. She added, “He was a great athlete. He played baseball, he snowboarded, he skied, he water-skied, he roller-bladed, he rode motorcycles.” She stated that after his murder, “I don’t have any goals now. You know, it’s one day at a time.”
David Mowen, the father of Matthew Mowen, testified that Matthew was his only son and wanted to study medicine. “He was quite a young man. ... He was one of those special individuals that, for whatever reason, he had that ability to connect with many, many different types of people.” Of the impact of Matthew’s murder, his father testified: ‘ ‘It’s the same pain, the same misery, the same angriness that you have every single day. It doesn’t get better.” Matthew’s younger sister Jennifer also testified that she looked up to her brother, who always gave her comfort and strength.

Defense’s case for a sentence less than death and State’s rebuttal

The defense again called members of Johnson’s family, many of whom had already testified during the death-eligibility phase. These family members, including his young son, again testified about the positive aspects of Johnson’s character and their love for him.
Much testimony was presented regarding Johnson’s involvement with street gangs beginning when he was about 13 or 14 years old. Johnson joined the Six Duece Brims gang, affiliated with the larger Bloods gang, to stop the harassment of his family. A professor of sociology at the University of California at Berkeley tes *1352 tified about gangs and provided the jury with extensive sociological data.
Several specialists who had worked with Johnson also testified. Johnson’s former parole agent for the CYA testified that he supervised Johnson after his release from the juvenile program and found Johnson to be “a small, quiet young man that seemed to be pleasant and workable.” A therapist who worked with Johnson in 2000 at the Clark County Detention Center testified that Johnson “was a fairly consistent, decent person in that setting.” And a psychologist and clinical neuropsychologist profiled Johnson’s personality and summarized his life.
Two inmates testified that they saw inmate Irias fall over the second-tier balcony. Johnson’s alleged accomplice in the incident, Reginald Johnson (no relation to the appellant), testified that he alone, without Johnson’s participation, “assaulted [Irias] and helped him over the tier” because Irias was a child molester. Reginald’s former counsel confirmed that Reginald admitted to her that he did it.
A retired California Department of Corrections officer testified about the life that would be expected for an inmate sentenced to a term of life without the possibility of parole in Nevada’s Ely State Prison. To rebut this evidence, the State called the warden of the Southern Desert Correctional Facility.
Johnson made no statement in allocution.

Death sentences

The State made a closing argument, and Johnson’s two counsel made closing arguments. The State argued in rebuttal. A new set of written instructions was given to the jury. The jury returned four separate verdicts imposing a sentence of death for each of the murders.

DISCUSSION

I. Do the Confrontation Clause and Crawford v. Washington apply to the selection phase of a bifurcated capital penalty hearing?
Johnson contends that the district court committed reversible error by admitting copies of his inmate disciplinary reports from the Clark County Detention Center during the selection phase of his penalty hearing. Those reports, he asserts, violated the Sixth Amendment’s Confrontation Clause and Crawford[9] because they contained testimonial hearsay statements by witnesses who were *1353 not shown to be unavailable and whom he had no opportunity to cross-examine. He maintains that he is entitled to a new penalty hearing. We disagree.
We held in Summers that the right to confrontation does not apply to evidence admitted in a capital penalty hearing. Our holding in Summers applies to the entirety of a capital penalty hearing, irrespective of whether the hearing is bifurcated into distinct phases as Johnson’s hearing was. Even assuming that statements within the reports were testimonial under Crawford, pursuant to our reasoning in Summers, Johnson did not enjoy a Sixth Amendment right to confront their declarants. We conclude that the admission of the reports was not error and reversal is not warranted on this basis.
II. Did the district court abuse its discretion by admitting Johnson’s juvenile records into evidence?
Johnson contends that the district court abused its discretion by admitting juvenile records during the selection phase of his penalty hearing. He primarily relies upon the Supreme Court’s 2005 decision in Roper v. Simmons[10] for support, arguing that the admission of these records was ‘ ‘highly prejudicial.’ ’ We disagree.
The Supreme Court in Roper held that it was “cruel and unusual” to execute offenders who were under 18 years old when they committed their crimes.[11] The Court reasoned that juveniles by their very age and lack of development ‘ ‘cannot with reliability be classified among the worst offenders.”[12] However, Roper did not prohibit the admission of juvenile records during a death penalty hearing. Because there is no question that Johnson was not a juvenile when he committed the murders, his reliance upon Roper is misplaced.
Rather, “ ‘[t]he decision to admit particular evidence during the penalty phase is within the sound discretion of the district court and will not be disturbed absent an abuse of that discretion.’ ”[13] Evidence of character is admissible during a penalty hearing so long as it is relevant and the danger of unfair prejudice does not substantially outweigh its probative value.[14]
*1354 Here, the evidence of Johnson’s juvenile history primarily consisted of records and testimony regarding his participation in and conviction for the armed bank robbery in California in 1993 as a 15-year-old gang member and his subsequent successes and failures in the CYA program for juvenile offenders. This evidence also concerned his subsequent absconding from that program’s parole a few years later.
Johnson’s juvenile record was relevant to his character, revealing a pattern of escalating violent criminal behavior that began with his participation in an armed bank robbery and culminated in the quadruple murder he committed in this case. Although this evidence was prejudicial, it was not unfairly so. And it had significant probative value, showing not only his propensity for violence and gang involvement but also his amenability to rehabilitation — all relevant considerations in the determination of his sentence. Because this evidence was admitted only during the selection phase of his hearing, there are no concerns that it may have improperly influenced the jury’s weighing of aggravating and mitigating circumstances. We conclude that the district court did not abuse its discretion in admitting these records, and Johnson’s contention in this respect is without merit.[15]
III. Did the district court improperly allow the State to ask potential jurors “stake-out” questions during voir dire?
Johnson contends that the State asked sixteen potential jurors improper “stalce-out” questions that caused them “to pledge themselves to a future course of action and indoctrinate[d] them regarding potential issues before the evidence had been presented.” He maintains that these questions denied him an impartial jury. We disagree.
The purpose of “jury voir dire is to discover whether a juror ‘will consider and decide the facts impartially and conscientiously apply the law as charged by the court.’ ”[16] And its scope rests *1355 within the sound discretion of the district court, whose decision will be given considerable deference by this court.[17] Here, the State asked prospective jurors about their ability to carry out their responsibilities in accordance with NRS 175.554. Johnson’s counsel unsuccessfully objected. We conclude that this line of questioning was within the district court’s discretion to permit, and Johnson’s contention is without merit.
IV. Did prosecutorial misconduct deprive Johnson of a fair hearing?
Johnson contends that the prosecutor committed misconduct during the penalty hearing that deprived him of a fair hearing. Although we agree with Johnson that some remarks by the prosecutor were improper, the prejudice resulting from them was minimal, and they did not deprive him of a fair hearing.
‘“[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone.’ ”[18] Remarks by a prosecutor must be read in context[19] and, if improper, will constitute harmless error when there is overwhelming evidence of guilt and this court can determine that no prejudice resulted to the defendant.[20] Prejudice follows from a prosecutor’s remarks when they have “so infected the proceedings with unfairness as to make the results a denial of due process.’ ’[21] Johnson raises several allegations of prosecutorial misconduct during both phases of his penalty hearing. We will discuss each allegation separately below.
A. Alleged misconduct during the death-eligibility phase
Johnson raises three allegations of prosecutorial misconduct during the death-eligibility phase of the penalty hearing.
First, he contends that the following remarks by the prosecutor during closing arguments improperly compared him to others and “attempted to inflame the jury and invoke social pressure”:
I would submit to you that if you find that his upbringing outweighs this quadruple homicide, that is disrespectful to members of South Central L.A. who didn’t commit a quadruple homicide. Common sense tells us that many, many, many *1356 people in a similar upbringing haven’t done what Donte Johnson has done. If you were to find that his childhood is entitled to a greater weight of this quadruple homicide, it’s like telling people—
Johnson’s counsel objected. We conclude that the prosecutor’s remarks contained improper elements but did not result in prejudice.
This court held in Collier v. State[22] that it was improper to urge the jurors that if they wished to be considered moral they had to give the community what it needed and give the defendant what he deserved. Here, the prosecutor argued that if the jurors found in Johnson’s favor it would be “disrespectful to the members of South Central L.A.” How the public may react to their verdict, however, has no place in the jurors’ deliberative process. And the jurors were so instructed in Jury Instruction 14: “A verdict may never be influenced by prejudice or public opinion.’ ’
Pursuant to Collier and Jury Instruction 14, we conclude that telling the jury that if it did not reach a particular verdict it would disrespect a group of people improperly injected public opinion into the deliberative process. Yet any prejudice to Johnson was minimal, given the correct jury instruction and the strength of the State’s case against him.
Second, Johnson contends that the prosecutor violated a pretrial order by the district court when he referred to the victims as “boys” or “kids” during rebuttal argument. He is correct that the prosecutor violated the order, but we conclude he was not prejudiced.
The meaning of the terms “boys” or “kids” is relative in our society, depending upon the context of its use. And the terms do not inappropriately describe the victims in this case. One of the four victims was 17 years old; one was 19 years old; and two others were 20 years old. Referring to them as “young men” may have been the most appropriate collective description. But we conclude that the State’s handful of references to them as “boys” or “kids” did not prejudice Johnson.[23]
*1357 Third, Johnson contends that the prosecutor also improperly told the jury during rebuttal argument that prior to the crimes Johnson had overheard victim Matthew Mowen saying that he had made money touring with a rock band “selling pizzas and drugs.” Johnson objected, arguing that there was no evidence that Mowen ever sold pizzas. Johnson asserts that the argument improperly portrayed “the victims in a more positive light.” We agree with Johnson that the prosecutor’s remark was improper, but we conclude that he cannot show any prejudice.
‘ ‘ ‘A prosecutor may not argue facts or inferences not supported by the evidence.’ ”[24] Here, the State concedes that the evidence did not support its claim that Matthew once said that he made money “selling pizzas and drugs,” instead of just “drugs.” Thus, its reference to this as a fact was made in error. Nevertheless, the prosecutor’s misstatement was immaterial and did not give the State any cognizable advantage. We conclude that Johnson suffered no prejudice.
B. Alleged misconduct during the selection phase
Johnson raises one claim of prosecutorial misconduct during the selection phase of the penalty hearing. He contends that the prosecutor made remarks during his opening statement that referred to inadmissible evidence and were “highly prejudicial,” depriving him of a fair trial. We disagree.
This court has stated that a prosecutor “has a duty to refrain from making statements in opening arguments that cannot be proved at trial.”[25] But “[ejven if the prosecutor overstates in his opening statement what he is later able to prove at trial, misconduct does not lie unless the prosecutor makes these statements in bad faith.’[26]
Here, the prosecutor summarized the evidence he planned to present during the selection phase of the hearing:
You will hear about a phone call [Johnson] made, threatening to kill a young woman, a civilian.
*1358 You will hear about a letter he wrote where he put a hit out on Scale. You heard that name in the trial, Mr. Anderson, named Scale.
Johnson’s counsel objected, claiming that the State failed to give adequate notice that it would be introducing evidence of the alleged threatening phone call or letter. After reviewing the relevant documents, the district court found that the State had provided inadequate notice to Johnson and the evidence was inadmissible. Johnson does not contend that the remarks were made in bad faith, nor is there evidence to support such a contention. But the question of prejudice remains.
The prosecutor referred to serious allegations against Johnson, which carried some degree of prejudice because they suggested that Johnson would continue his violent criminal conduct, even while in prison. Yet the remarks were isolated, consisting of three sentences during a five-day selection phase. And there is no indication that the prosecutor again referred to these particular bad acts. Moreover, immediately after the State’s opening statement the district court admonished the jury that opening statements are “not evidence and should not be given evidentiary value.” Given that the remarks were brief, were not made in bad faith, and occurred during a lengthy selection phase and the district court admonished the jurors, we conclude that any prejudice from these remarks was minimal.
V. Was Johnson’s hearing unfair because a victim’s brother groaned and passed out in the courtroom?
Johnson contends that his penalty hearing was rendered unfair because during the State’s closing argument in the death-eligibility phase, Nick Gorringe, brother of victim Tracey Gorringe, was seated on a bench in the second row in the courtroom and either passed out or fell over when a picture of the crime scene was displayed. Johnson asserts that this incident is analogous to that in Hollaway v. State.[27] We disagree.
Unlike the facts of Holloway, the incident in this case did not concern a stun belt or any type of device under the State’s control causing an effect on Johnson.[28] In fact, it did not involve Johnson at all. Although Nick Gorringe was a victim’s brother, he was also a member of the public who had a right to observe the courtroom proceedings. He was not called as a witness, and no further *1359 incidents occurred. Moreover, the district court promptly excused the jurors and admonished them. We conclude that Johnson’s rebanee on Holloway is misplaced and that any prejudice from this incident was minimal.[29]
VI. Mandatory review
We are required pursuant to NRS 177.055(2)(c)-(e) to review every death sentence and independently consider three issues.
First, we consider whether the evidence supports the finding of the aggravating circumstance. NRS 200.033(12) provides in part that first-degree murder is aggravated when “[t]he defendant has, in the immediate proceeding, been convicted of more than one offense of murder in the first or second degree.” Here, Johnson was convicted of four first-degree murders during the guilt phase of his 2000 trial, and this court affirmed those convictions. Overwhelming evidence supported this single aggravator found by the jury for each of the murders.
We consider next whether Johnson’s death sentence was imposed under the influence of passion, prejudice, or any arbitrary factor. Some unusual things happened during Johnson’s penalty hearing. For example, as discussed above, one of the victim’s brothers passed out in the courtroom when a photo of the crime scene was displayed. Also, a juror found what appeared to be a crack pipe in the jury box.[30] None of these unusual episodes, however, appears to have influenced the jury’s verdict.
Finally, we determine whether Johnson’s death sentence was excessive considering both the crime and the defendant. Johnson bound and shot four young men execution-style in the head during a late-night robbery of a Las Vegas home. These young men were dearly loved by their parents, siblings, and friends. In exchange for *1360 his murderous deeds, Johnson obtained about $200 in cash, a VCR, a PlayStation, and a beeper. He also bragged about his victims’ deaths, callously laughing as he told friends the following morning about how blood squirted out of one victim’s head and the sound the victim made when shot.
Johnson was only 19 years old when he committed these crimes, and he unquestionably had an impoverished childhood. But the murders he committed were unprovoked, vicious, and utterly senseless. We conclude that a sentence of death was not excessive.

CONCLUSION

Johnson’s penalty hearing was not without error, but it was fair. Applying our holding in Summers, we conclude that neither the Confrontation Clause nor Crawford applies to evidence admitted during the selection phase of a bifurcated penalty hearing. We conclude that Johnson’s other issues do not establish reversible error.
We affirm Johnson’s death sentence.
Becker, Gibbons and Parraguirre, JJ., concur.

 Johnson v. State, 118 Nev. 787, 801-04, 59 P.3d 450, 460-61 (2002) (citing Ring, 536 U.S. 584 (2002)).

 541 U.S. 36 (2004).

 122 Nev. 1326, 148 P.3d 778 (2006).

 Johnson, 118 Nev. at 791-93, 59 P.3d at 453-54.

 Id. at 806, 59 P.3d at 463.

 536 U.S. at 609.

 Johnson, 118 Nev. at 804, 59 P.3d at 461.

 An aggravator based on NRS 200.033(4) that was found by the three-judge panel during Johnson’s previous penalty hearing was stricken during a pretrial hearing by the district court pursuant to this court’s decision in McConnell v. State, 120 Nev. 1043, 102 P.3d 606 (2004).

 541 U.S. 36.

 543 U.S. 551 (2005).

 Id. at 568.

 Id. at 569.

 McConnell, 120 Nev. at 1057, 102 P.3d at 616 (quoting McKenna v. State, 114 Nev. 1044, 1051, 968 P.2d 739, 744 (1998)).

 See Hollaway v. State, 116 Nev. 732, 746, 6 P.3d 987, 997 (2000); see also NRS 175.552(3).
*1354 In an unbifurcated penalty hearing, a cautionary instruction regarding the evidence’s proper use must also be given. See McConnell, 120 Nev. at 1057, 102 P.3d at 616-17. Because Johnson’s penalty hearing was bifurcated and the evidence in question only came in during the selection phase, such an instruction was neither given nor necessary.

 See Domingues v. State, 112 Nev. 683 , 696-97, 917 P.2d 1364, 1373-74 (1996) (affirming the admission of a defendant’s juvenile record during a capital penalty hearing).

 Witter v. State, 112 Nev. 908, 914, 921 P.2d 886, 891 (1996) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). We recognize that Byford v. State, 116 Nev. 215, 235-36, 994 P.2d 700, 714 (2000), supersedes Witter on the unrelated question of instructing jurors regarding deliberate and premeditated murder.

 Witter, 112 Nev. at 914, 921 P.2d at 891.

 Hernandez v. State, 118 Nev. 513, 525, 50 P.3d 1100, 1108 (2002) (quoting United States v. Young, 470 U.S. 1, 11 (1985)).

 Butler v. State, 120 Nev. 879, 896, 102 P.3d 71, 83 (2004).

 See Pellegrini v. State, 104 Nev. 625, 628-29, 764 P.2d 484, 487 (1988).

 Thomas v. State, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004) (citing Darden v. Wainwright, 477 U.S. 168, 181 (1986)).

 101 Nev. 473, 479, 705 P.2d 1126, 1129-30 (1985).

 The State contends that Johnson only raised an objection to one of the references and the others were not preserved for review. We disagree. Johnson filed a pretrial motion in limine regarding these references, which was argued by the parties and ruled on by the district court. We conclude that this entire matter was properly preserved for our review. See Richmond v. State, 118 Nev. 924, 932, 59 P.3d 1249, 1254 (2002).

 Miller v. State, 121 Nev. 92, 100, 110 P.3d 53, 59 (2005) (quoting Williams v. State, 103 Nev. 106, 110, 734 P.2d 700, 703 (1987)).

 Rice v. State, 113 Nev. 1300, 1312, 949 P.2d 262, 270 (1997), modified on other grounds by Richmond, 118 Nev. at 932, 59 P.3d at 1254.

 Id. at 1312-13, 949 P.2d at 270.

 116 Nev. 732, 6 P.3d 987.

 Id. at 740, 6 P.3d at 993.

 Johnson also contends that he is entitled to relief because of cumulative errors that occurred during his penalty hearing. However, as discussed above, the errors that occurred during Johnson’s hearing resulted in minimal prejudice to him. Even when these errors are considered cumulatively, we conclude that they do not entitle him to relief. See Hernandez, 118 Nev. at 535, 50 P.3d at 1115.

 During the selection phase, a juror discovered the apparent pipe lying on the floor of the jury box. The juror informed the courtroom bailiff, who prepared a report. The district court and counsel for both the State and Johnson were informed about this matter.