# IN THE SUPREME COURT OF IOWA

No. 20–1551

Submitted January 19, 2023—Filed April 21, 2023

**STATE OF IOWA,**

Appellee,

vs.

**PATRICK HENRY BOOKER JR.,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Dubuque County, Monica L. Zrinyi Wittig, Judge.

The defendant seeks further review of the court of appeals opinion affirming his conviction for sexual abuse in the third degree and his life sentence, challenging the denial of his *Batson* claim. **DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT OF CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED.**

Oxley, J., delivered the opinion of the court in which all participating justices joined. Mansfield, J., filed a concurring opinion, in which Christensen, C.J., and McDermott, J., joined. May, J., took no part in the consideration or decision of the case.

Martha J. Lucey (argued), State Appellate Defender, and Stephan J. Japuntich (until withdrawal), for appellant.

Brenna Bird, Attorney General, and Sheryl Soich (argued), Assistant Attorney General, for appellee.

**OXLEY, Justice.**

We are asked to decide whether the prosecutor engaged in purposeful discrimination during jury selection in Patrick Booker's trial for sexual abuse in the third degree when he used a peremptory strike to remove a Black venire member. Upon our review of the record, we conclude the strike was not motivated in substantial part by discriminatory intent—the relevant standard under federal law. The strike at issue here was justified by a valid nonracial basis. The stricken juror expressed his opinion that "both parties" were to blame in describing the sexual assault that landed his cousin in prison for fifty years in a scenario factually similar to the case about to be tried. A prosecutor could have logically been concerned the juror would form a similar opinion about the victim when presented with the facts of this case. The prosecutor's stated concern about the juror's opinion was, at least in this context, a valid, nonracial basis for the peremptory strike.

### I. Background Facts and Proceedings.

The defendant, Patrick Henry Booker Jr. (who is Black), was charged by criminal complaint on May 30, 2019, with first-degree kidnapping and third-degree sexual abuse as a second or subsequent offender.

The charges were based on an incident that occurred at the Dubuque home of C.H. in the late-night to early-morning hours of April 14–15, 2018. C.H. invited (among others) Booker and Andy Cheeks to her home to attend a "tattoo party." As C.H. described, this is an event where "people c[a]me to [her] house to get tattoos or piercings." Booker performed piercings at the party. C.H. planned

to have group sex with Booker and Cheeks after the party. When the party ended, Booker began to insist that C.H. have sex with his brother as well; she became uncomfortable and attempted to leave the group. Booker then slammed C.H.'s head against a wall and made her stand by an open window, letting in cold air "for approximately 5 1/2 hours." When C.H. finally got permission from Booker to leave her spot in front of the window she headed back into the bedroom to lie down, but Booker followed her again, tearing off her clothes and, according to C.H., forcing her to have intercourse. Fearing retribution from Booker, C.H. waited several days after the incident before reporting it to the police.

Trial began on September 15, 2020. The jury found Booker not guilty of first-degree kidnapping but guilty of third-degree sexual abuse. The jury also found that Booker had committed a prior sexual offense, which enhanced the penalty for his conviction. *See* Iowa Code § 902.14 (2018) (making a second or subsequent offense for certain sexual abuse convictions a class "A" felony). On November 23, Booker was sentenced to a mandatory term of life imprisonment.

Booker appealed, and we transferred the case to the court of appeals to address his appellate challenges, including, inter alia: (1) neither the conviction nor the sentencing enhancement was supported by sufficient evidence; (2) the court erroneously overruled a *Batson* challenge[1] to one of the State's peremptory strikes; (3) the court erroneously granted the State's for-cause challenge to another juror; and (4) the court lacked jurisdiction to enter a nunc pro tunc order

---

[1]*See Batson v. Kentucky*, 476 U.S. 79 (1986).

amending Booker's sentence after he filed his notice of appeal. The court of appeals rejected all of Booker's arguments except his challenge to the court's jurisdiction to enter the nunc pro tunc order, and it remanded for the district court to correct Booker's sentence (by adding the Iowa Code section 903B.1 special sentence to the written disposition) as it had attempted to do through the belated nunc pro tunc order in the first instance.

We granted further review to consider Booker's *Batson* challenge.

**II. Analysis.**

"When we grant further review, we may exercise our discretion to let the court of appeals decision stand as the final decision on particular issues." *Farnsworth v. State*, 982 N.W.2d 128, 135 (Iowa 2022) (quoting *State v. Fogg*, 936 N.W.2d 664, 667 n.1 (Iowa 2019)); *see State v. Jonas*, 904 N.W.2d 566, 568 (Iowa 2017). We do so here with respect to all of Booker's challenges except the two involving the jury selection process and his challenge to the sufficiency of the evidence for his sentencing enhancement, which the court of appeals found was not preserved and therefore did not review. We start with the sentencing enhancement and then address the *Batson* and for-cause challenges related to the jury selection process.

**A. Sentencing Enhancement Evidence.** We review the sufficiency of the evidence supporting Booker's sentencing enhancement for correction of errors at law. *See State v. Reed*, 875 N.W.2d 693, 704–05 (Iowa 2016). "[W]e view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from

the record evidence.' " *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)).

Booker's trial was conducted in two phases. In the first phase, the jury found Booker guilty of third-degree sexual abuse under Iowa Code section 709.4(1)(*a*). Immediately following that verdict, the trial proceeded to a second phase where the State sought to prove this was Booker's second conviction for an act of sexual abuse in order to enhance his sentence under Iowa Code section 902.14(1). *See* Iowa R. Crim. P. 2.19(9). To support the enhancement, the State introduced a Cook County, Illinois record of conviction for one "Patrick Booker" and offered the testimony of Andy Cheeks. The jury found Booker had previously been convicted of an act of sexual abuse.

Booker challenges the State's use of the record of conviction from Cook County, arguing that since the record only identifies a "Patrick Booker," rather than his full name, "Patrick Henry Booker Jr.," the State did not present sufficient evidence to prove that the "Patrick Booker" convicted in Cook County was actually him. The court of appeals did not address the merits of Booker's sufficiency claim because he failed to move for a judgment of acquittal.

The court of appeals opinion was filed nearly one month to the day before this court's opinion in *State v. Crawford*, where we held that filing a motion for judgment of acquittal is not necessary to preserve sufficiency-of-the-evidence challenges for appellate review. 972 N.W.2d at 200–02. Whether Booker filed a separate motion for judgment of acquittal prior to submission to the jury of the enhancement issue is therefore irrelevant, and we reach the merits of his claim.

That said, we hold that Booker's sufficiency claim fails. To supplement the Cook County record of conviction, the State called Andy Cheeks to testify. Cheeks explained that he was a codefendant with Booker in the Cook County case and identified Booker as the same "Patrick Booker" from that case. If the State offered only the Cook County record, Booker's argument that his surname is common enough to question whether the prior record belonged to someone else might have more sway. But here, Cheeks's testimony, if believed, provided the necessary link. *See id.* at 202 (drawing all inferences in favor of jury's verdict). The State presented sufficient evidence to support the jury's finding that Booker was previously convicted of an act of sexual abuse for purposes of the sentencing enhancement, and imposition of the enhancement is affirmed.

**B. *Batson* Challenge.** Booker's first issue with the jury selection process involves the State's use of a peremptory strike to remove Juror 38 from the venire. Booker contends this strike was improperly motivated by racial discrimination in violation of the Equal Protection Clauses of the United States and Iowa Constitutions. U.S. Const. amend. XIV; Iowa Const. art. I, § 6; *see Batson v. Kentucky,* 476 U.S. 79 (1986).

When a party challenges a peremptory strike as racially discriminatory, *Batson*'s burden-shifting framework resolves the challenge through a three-step inquiry: (1) the challenging party (here, Booker) must establish a prima facie case of purposeful racial discrimination in the peremptory strike (i.e., the State's strike of Juror 38); (2) the striking party (here, the State) must proffer a race-neutral explanation for the strike; and finally, (3) the challenging party

must carry the ultimate burden of proving purposeful discrimination.[2] *See State v. Veal*, 930 N.W.2d 319, 332 (Iowa 2019); *see also Batson*, 476 U.S. at 96–98. We conduct a de novo review of the record when making this inquiry, but at step three, "we give 'a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney' " who made the strike. *Veal*, 930 N.W.2d at 327 (quoting *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012)).

On the first day of voir dire[3] (when Juror 38 was not present), the prosecutor alluded to the Black Lives Matter movement, asking whether any of the jurors had "attended, spoke at, or otherwise supported a demonstration in support of Black Lives Matter." Two jurors gave affirmative responses, but the prosecutor did not follow up with them on this line of questioning, instead transitioning to whether any juror got "the majority of their news from Facebook or social media." Black Lives Matter was not raised again after the first day of jury selection.

Juror 38 was questioned during the second day of voir dire. In response to the prosecutor's first line of questioning about whether anyone ever "deserves

---

[2]Despite some discussion during oral argument about whether the *Batson* framework should be discarded or modified under the Iowa Constitution, these arguments were not advanced in the appellate briefs or at trial. We therefore analyze Booker's *Batson* challenge under the traditional three-part framework outlined by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79. *Cf. State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021) (declining, but not foreclosing, a separate analysis of whether to depart from the Fourth Amendment framework under article I, section 8 of the Iowa Constitution where the defendant suggested the Iowa Constitution should provide greater protection but did not actually ask us to depart from the federal framework or separately brief and analyze the state constitutional argument).

[3]Booker's trial was held under our modified COVID-19 pandemic measures, one of which required limiting the number of people in a courtroom, which in turn necessitated splitting voir dire into smaller, separate groups.

to be raped," Juror 38 echoed the sentiments of Juror 39 that no one does, but volunteered, "There's always two sides to a story."

When the prosecutor then asked whether Juror 38 believes "it's common for women to claim that they've been sexually assaulted without necessarily having said no or something like that," Juror 38 posited a scenario in which a woman said she did not want to have sex but, while intoxicated, did have sex, then after becoming sober, felt bad about the experience because she had cheated on her boyfriend. In response to the prosecutor's follow-up question of whether Juror 38 believes "that happens at all," Juror 38 explained that his cousin was serving a fifty-year prison sentence from an incident arising "under the same thing. They had a party, and like four or five guys had sex with a girl, that was at the party." Although he indicated his only knowledge of the incident came from his cousin, when asked "who [he] blame[s] more in that situation"— the woman "for being put in that situation," or his cousin "for being one of the guys who partook"—Juror 38 indicated he believed "both parties" were to blame.

Later, during defense counsel's questioning, Juror 38 indicated that he was running on very little sleep that morning because he worked a third-shift (overnight) job. The court clarified that "if [he was] chosen to sit on this panel, [the court could] provide [him] with a notice to [his] employer. [He would] not have to work tonight."

At the end of voir dire, the State used one of its peremptory strikes to excuse Juror 38, and defense counsel lodged a *Batson* challenge. In response, the prosecutor cited Juror 38's third-shift job obligations and, "[m]ore

concerning" to the State, Juror 38's discussion about his cousin's fifty-year sentence for a sex abuse conviction and his apparent views that his cousin and the victim were both to blame.

The district court initially indicated it would uphold Booker's challenge. The court observed that Juror 38 followed and answered questions from the attorneys, was not as emotional as some of the jurors from the first day who "would have probably been too emotionally vested in their own circumstances to be able to separate that out from what was going on here in this courtroom," and "would be capable of following the Court's instructions," leading the court to conclude the State had not met its burden to support the strike. But after taking a brief recess to review caselaw on the issue, the court changed its mind and overruled Booker's *Batson* challenge. In revisiting the issue, the court explained it had reviewed its notes and could not say the State was engaged in a pattern of racial discrimination in making its strikes given the treatment of other individuals who had also expressed varying degrees of experience with sexual assault allegations. Ultimately, the court concluded the State provided a race-neutral basis and allowed the strike to stand.[4]

Turning to our analysis of the *Batson* claim—because the prosecutor offered and the court considered race-neutral justifications for the strike, "the

---

[4]It appears the district court initially applied a for-cause standard, considering whether Juror 38 had been rehabilitated concerning his remarks about both the accused and the victim being at fault in a sexual assault case. But, as the district court seemed to recognize after the recess, "[t]he prosecutor's explanation [for a peremptory strike] 'need not rise to the level justifying exercise of a challenge for cause.'" *State v. Griffin*, 564 N.W.2d 370, 375 (Iowa 1997) (quoting *Batson*, 476 U.S. at 97).

preliminary issue of whether [Booker] ha[s] made a prima facie showing [is] moot." *Mootz*, 808 N.W.2d at 218 (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991)). That said, we briefly address the court of appeals' conclusion that "striking the sole Black juror on a panel is not *itself* sufficient to generate an inference of purposeful racial discrimination" at the first *Batson* step. *Batson* necessarily requires a heavily context-specific inquiry, so although striking the sole Black juror does not, *in a vacuum*, establish a prima facie case, that fact in itself is relevant to the analysis and may be sufficient when viewed in context. *Cf. Batson*, 476 U.S. at 93–97 ("We have confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."); *cf. also Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) ("[W]e accordingly held [in *Batson*] that a defendant c[an] make out a prima facie case of discriminatory jury selection by 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial." (quoting *Batson*, 476 U.S. at 94)).

At step two, the State must proffer a racially-neutral justification for its strike. "At this step of the inquiry, the issue is the facial validity of the [attorney's] explanation. Unless a discriminatory intent is inherent in the [attorney's] explanation, the reason offered will be deemed race neutral." *Mootz*, 808 N.W.2d at 218 (alterations in original) (quoting *Hernandez*, 500 U.S. at 360). A prosecutor's justifications " 'need not rise to the level justifying exercise of a challenge for cause' but must be race-neutral and 'related to the particular case

to be tried.' " *Veal*, 930 N.W.2d at 334 (quoting *State v. Griffin*, 564 N.W.2d 370, 375 (Iowa 1997)). At this stage, the reasons given need not be "persuasive, or even plausible." *Mootz*, 808 N.W.2d at 218 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)). "It is not until step three 'that the persuasiveness of the justification becomes relevant.' " *Id.* (quoting *Purkett*, 514 U.S. at 768).

In this case the State offered two justifications for its strike: (1) Juror 38's third-shift work obligations; and (2) Juror 38's views about his cousin's imprisonment for a similar crime—specifically "[t]he lesson he drew from his cousin['s] [experience] was that there were two sides to every story, and that the victim and his cousin were probably equally to blame." For brevity's sake, we will refer to this justification as the "cousin narrative." Both of these are facially race-neutral reasons.

First, the effect of Juror 38's third-shift job on his ability to focus during trial is not a characteristic peculiar to his race. *Cf. Purkett*, 514 U.S. at 769 ("The wearing of beards is not a characteristic that is peculiar to any race." (quoting *EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 190 n.3 (3d Cir. 1980))). We agree with the court of appeals' recent conclusion that this is a facially neutral justification for a strike. *See State v. Price*, No. 19–1692, 2021 WL 4593228, at *4–5 (Iowa Ct. App. Oct. 6, 2021) (deferring to district court's determination that juror's work obligation, which "allows her very little time to sleep," was a valid, race-neutral justification for a peremptory strike); *State v. Malone*, No. 19–1680, 2021 WL 1400709, at *5–6 (Iowa Ct. App. Apr. 14, 2021) ("The prosecutor also

noted S.M.'s late-night work shift, which appeared to leave her less than alert in the court room. These are race-neutral reasons.").

Second, in regard to the cousin narrative, we "have repeatedly noted that a juror's interactions with law enforcement and the legal system are . . . valid, race-neutral reason[s] for a peremptory challenge." *Veal*, 930 N.W.2d at 334 (quoting *Mootz*, 808 N.W.2d at 219). Booker claims that this justification is at least implicitly race-based because African-Americans are more likely to have negative interactions with law enforcement, leading to more experience with the criminal justice system than the general population and, as a result, a greater likelihood that African-Americans will be excluded from juries. But that is not what happened here. Rather than relying on some tangential negative encounter with law enforcement to say that Juror 38 might be biased against police or the State generally, the State's justification focused on how Juror 38's familiarity with and perspective of a very similar set of circumstances might shape his perspective of this particular case. Under the circumstances, we cannot say this justification inherently violates equal protection. *See Mootz*, 808 N.W.2d at 218 ("The reason given must, in and of itself, violate equal protection" for a challenge to succeed at step two of the *Batson* analysis).

Finally, proceeding to step-three of the *Batson* inquiry, we must "decide whether to believe the [attorney's] explanation for the peremptory challenges," or whether the reasons given are merely pretext for racial discrimination. *Id.* at 219 (alteration in original) (quoting *State v. Veal*, 564 N.W.2d 797, 807 (Iowa 1997), *overruled in part on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa

1998), *vacated*, 527 U.S. 1001 (1999)). At this stage, "[b]ecause the trial judge's finding whether purposeful discrimination exists will largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990); *see also Veal*, 930 N.W.2d at 327 (noting that although review is de novo, "we give 'a great deal of deference to the district court's evaluation of credibility when determining the true motives of the attorney when making strikes' " (quoting *Mootz*, 808 N.W.2d at 214)). The ultimate inquiry is whether, under the totality of the circumstances, the strike was "motivated in substantial part by discriminatory intent." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019) (quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016)).

Booker challenges whether Juror 38's third-shift work schedule really motivated the prosecutor's strike, pointing to the district court's statement it would clear his absence with his employer, and the lack of record support for the prosecutor's belief that Juror 38 would nonetheless continue working during the trial. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008); *Miller-El*, 545 U.S. at 252 (noting that "[i]f the stated reason [for a strike] does not hold up" it has "pretextual significance" that "does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false"). We need not decide whether the prosecutor offered the third-shift concern as a pretext to hide his real motive because we conclude that Juror 38's cousin narrative justified the prosecutor's strike on nonracial grounds.

In determining whether the prosecutor's proffered justification for a peremptory strike is pretextual, courts may consider "a variety of evidence," including whether the prosecutor struck or kept similarly situated jurors and whether his explanation for the strike is consistent with the record. *Flowers*, 139 S. Ct. at 2243 (listing evidence a *Batson* challenger may present to support his claim, including "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case; [and] a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing"). Here, it is true that the prosecutor misstated the record (whether intentionally or not) in defending against the *Batson* challenge when he claimed Juror 38 "expressed very clearly that his opinion was, his cousin was wrongfully accused." At the very least, that premise is belied by Juror 38's statement that "both parties" were to blame in his cousin's case—i.e., both the victim *and* his cousin.

Nonetheless, Juror 38's cousin narrative raised legitimate concerns given its similarity to the facts of the case at hand. The prosecutor sought to identify jurors who might be unsympathetic to the victim, asking the jury whether C.H. "br[ought] [the rape] upon herself" by inviting Booker to her apartment and initially agreeing to have sex with him and Andy Cheeks. As the prosecutor discussed extensively during closing arguments, the specific facts of the case did not paint C.H. in a sympathetic light, which might have made jurors skeptical of

her claim.[5] But C.H. was the linchpin of the State's case.[6] Given Juror 38's perspective of his cousin's experience, it is no mystery why the prosecutor felt he could have a more difficult time persuading Juror 38 to believe C.H. and view the case from the State's perspective. It would be fair for the prosecutor to have concerns that when asked, "Did [C.H.] bring it upon herself," Juror 38 would be more receptive than others to the notion that she did.

Importantly, the prosecutor did not limit his concerns about potential "victim blaming" solely to Juror 38. Juror 24 indicated prior experience with instances affirmatively involving false accusations of sexual abuse, and the State successfully challenged her for cause. Jurors 4 and 18 also indicated they knew someone accused of sexual assault, and although it is not clear from the record which party struck them, neither served on the petit jury. We therefore find—as did the district court, to whom we give "a great deal of deference," *Veal*, 930 N.W.2d at 327 (quoting *Mootz*, 808 N.W.2d at 214)—that the prosecutor's stated motivation to strike Juror 38 based on the cousin narrative was sincere.

A final note on the prosecutor's reference to the Black Lives Matter movement. Although the question may have needlessly inserted race into this case, it was not asked in Juror 38's presence (or in the presence of any minority

---

[5]"I mean, she's a little pitiful, you know. . . . She's not a classy individual, right?"

[6]The prosecutor concluded his closing argument as follows:

If you're going to find reasonable doubt in this case, it has to come from her. It has to give you a reason to think that she is telling a lie about what happened. And if that reason is, I can't relate to her, I don't trust her, she's obviously a rough customer, if that reason is, she has made bad life choices, then maybe she did deserve to get raped.

A final note on the prosecutor's reference to the Black Lives Matter movement. Although the question may have needlessly inserted race into this case, it was not asked in Juror 38's presence (or in the presence of any minority juror, as far as we can tell from the record) and the prosecutor did not follow up on it after two jurors gave affirmative responses. So, unless we were to say the question so clearly reflected the prosecutor's racial biases that his asserted motives in striking Juror 38 are unbelievable at step three, it does not alter our Batson analysis.

Viewing the totality of the circumstances, we cannot say that the prosecutor's strike of Juror 38 was substantially motivated by discriminatory intent. The fact that a prosecutor unnecessarily proffers weak justifications (like the work conflict justification here) when the primary reason for the strike could easily have stood alone may itself be viewed as evidence of pretext.[7] Nevertheless, any discriminatory inference that may be deduced from that evidence does not rise to the substantial level necessary to successfully challenge a strike under *Batson* when considered under the totality of the circumstances of this case. *See Flowers*, 139 S. Ct. at 2244.

For the foregoing reasons, we hold the district court did not err in overruling Booker's *Batson* challenge.

---

[7]The inference is, in essence, that "[t]he [prosecutor] doth protest too much." William Shakespeare, *Hamlet* act 3, sc. 2, l. 220.

**C. For-Cause Challenge.** Booker's next jury selection challenge charges the district court with error in sustaining the prosecutor's for-cause strike of Juror 24. District courts are "vested with broad discretion in" ruling on for-cause challenges to potential jurors; we accordingly review for abuse of that discretion. *Jonas*, 904 N.W.2d at 570–71.

Booker's first argument on this point takes issue with the State's failure to specify the basis for its challenge as required under Iowa Rule of Criminal Procedure 2.18(5). True, Juror 24 indicated facts about herself that implicated multiple potential bases for a strike for-cause, including that she may have known the defense attorney through "mutual acquaintances" and "Facebook interaction," *see id.* r. 2.18(5)(*d*); and that she had trouble hearing out of one ear, *see id.* r. 2.18(5)(*c*). But based on the discussion held in chambers, both the court and defense counsel were well aware of why the State was raising a for-cause challenge. When the district court separated Juror 24 from the rest of the venire for individual questioning on the State's for-cause challenge, both defense counsel (who questioned Juror 24 first during this session) and the court focused almost exclusively on Juror 24's personal knowledge about other incidents of sex abuse. Juror 24 stated she knew "several [people who were] falsely accused" of sexual assault in Dubuque in cases where the accusers "admitted that they lied," making her "more hesitant than most people" to judge the case on its own merits. *See id.* r. 2.18(5)(*k*). Booker's argument is well-taken that the prosecutor was required to "distinctly specify the facts constituting the

cause[]" for his challenge, *id.* r. 2.18(5) , but we do not believe any violation in this case constituted reversible error.

When pressed on whether her experiences would cause her to hold the State to a higher burden than it was required to carry, Juror 24 wavered between indicating that she "wouldn't hold anybody to a higher standard of proving anything," and that she did not "want to have any doubt" because she has "seen too many false accusations." Emphasizing her former statements, Booker also challenges the for-cause strike by arguing that despite any biases Juror 24 may have expressed against the State or alleged victims generally, she had been rehabilitated, thus negating the State's grounds for the strike. The court of appeals declined to reach the merits of this issue, agreeing with the State that even if it was error to strike Juror 24, Booker failed to show prejudice. *See Summy v. City of Des Moines*, 708 N.W.2d 333, 339–40 (Iowa 2006) ("Prejudice from the erroneous exclusion of a juror will not be presumed."), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699 (Iowa 2016).

We agree with the court of appeals. Although we have recently eased the burden on a party seeking to establish prejudice from an erroneous *denial* of a for-cause challenge, *see Jonas*, 904 N.W.2d at 570–71, it has been long-settled in Iowa (and across the country generally) that in order to establish prejudice from the erroneous *grant* of a for-cause challenge a party must show that "the resulting jury was not impartial and competent," *Summy*, 708 N.W.2d at 339–40. *See Johnson v. City of Waterloo*, 119 N.W. 70, 71 (Iowa 1909) (collecting cases for support of the proposition that "though a qualified juror be excused, another

equally competent and fair minded will be selected in his stead, and, if a competent and impartial jury is finally secured before whom the cause is tried, neither party is in a situation to complain"); *see also N. Pac. R. Co. v. Herbert*, 116 U.S. 642, 646 (1886) ("[I]f we regard the challenge as for cause, its allowance did not prejudice the company. A competent and unbiased juror was selected and sworn, and the company had, therefore, a trial by an impartial jury, which was all it could demand."); *United States v. Cornell*, 25 F. Cas. 650, 656 (D.R.I. 1820) (Story, J.) ("Even if a juror had been set aside by the court, for an insufficient cause, I do not know that it is matter of error, if the trial has been by a jury duly sworn and impaneled, and above all exceptions. Neither the prisoner nor the government in such a case have suffered any injury.").

Booker does not attempt to show that his petit jury was partial or incompetent. Rather, his prejudice argument maintains that if the court erred in allowing the strike, then it effectively granted the prosecutor an additional peremptory strike by sparing him from using one to remove Juror 24. In essence, Booker argues for a per se prejudice rule: once the district court is determined to have erred as a legal matter, then the legally erroneous for-cause strike is automatically treated as a peremptory strike. This argument has been considered and rejected by other courts. *See United States v. Mills*, 987 F.2d 1311, 1314 (8th Cir. 1993) ("Mills contends that the [district court's grant of the prosecutor's for-cause] strikes 'effectively awarded the prosecution two additional peremptory challenges.' We disagree."); *Jones v. State*, 982 S.W.2d 386, 393–94 (Tex. Crim. App. 1998) (en banc) (rejecting as flawed "the statement

that the effect of [a district court's] erroneous exclusion [of a juror for cause] 'is the same as if the State had been given an extra peremptory challenge' " (quoting *Payton v. State*, 572 S.W.2d 677, 680 (Tex. Crim. App. 1978) (en banc), *overruled by Jones*, 982 S.W.2d at 386)); *State v. Mendoza*, 596 N.W.2d 736, 747 (Wis. 1999). We agree with their reasoning and therefore reject Booker's argument that it was enough to show he was prejudiced because the State effectively received an extra strike.

To summarize those courts' analysis, Booker's position is flawed because for-cause and peremptory strikes are inherently different mechanisms for removing prospective jurors from a venire. The absence of one does not establish the presence of the other. *See NLRB v. Noel Canning*, 573 U.S. 513, 589 (2014) (Scalia, J., concurring in the judgment) ("To assume otherwise . . . is to commit the fallacy of the inverse (otherwise known as denying the antecedent): the incorrect assumption that if P implies Q, then not-P implies not-Q."). True, the effects of both may for all practical purposes be the same since a juror is removed either way. But the rigor of the for-cause challenge process distinguishes even an erroneously granted for-cause strike from an "extra" peremptory strike. The challenging party must justify the basis for the for-cause challenge and that challenge is scrutinized by the court. That the court makes the wrong call in that party's favor does not change that process. Conversely, it is precisely the absence of that rigor—the lack of scrutiny into the reasons for the strike (aside from a *Batson* challenge) and the absence of a need for any reason at all—that makes a peremptory strike. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 147–48

(1994) (O'Connor, J., concurring) ("[T]he essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." (quoting *Swain v. Alabama*, 380 U.S. 202, 220 (1965), *overruled by Batson*, 476 U.S. 79)); *United States v. Elliott*, 89 F.3d 1360, 1365 (8th Cir. 1996) ("There is simply no legal basis for this argument, which fails to recognize that peremptory strikes, for which no reasons need be given (absent a *Batson* challenge), are different from challenges for cause, which by definition require a showing of cause."); *Mootz*, 808 N.W.2d at 215 (noting that, aside from the *Batson* context, "a peremptory challenge is, by its very nature, a capricious and arbitrary statutory right"). In other words, "[t]he erroneous dismissal of a prospective juror constitutes an error by the court; it does not compute as a peremptory challenge by a party." *Mendoza*, 596 N.W.2d at 747.

We therefore hold that any error in the district court's decision to excuse Juror 24 for cause did not prejudice Booker absent evidence that the seated petit jury was partial or incompetent. Accordingly, reversal is not warranted on this ground.

### III. Conclusion.

For the reasons stated above, we affirm the district court's denial of Booker's challenges to the sufficiency of the evidence supporting his sentencing enhancement and to the jury selection process. As to Booker's other challenges, the decision of the court of appeals stands unmodified.

**DECISION OF COURT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT OF CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED.**

All justices concur except May, J., who takes no part. Mansfield, J., files a concurring opinion, in which Christensen, C.J., and McDermott, J., join.

**MANSFIELD, Justice (concurring).**

I join the court's well-reasoned opinion, but I write separately to take issue with the prosecutor's voir dire questioning of prospective jurors about Black Lives Matter. In the context of this case, I believe such questioning was inappropriate. This case didn't involve any issue of alleged police misconduct or even police credibility; it simply involved a Black defendant. Thus, I view the questioning as an improper attempt to identify prospective jurors who might be concerned about the overall status of Black Americans in our society. And just as we don't allow prosecutors to reflexively strike Black Americans from juries, we shouldn't allow prosecutors to reflexively strike whites who might be sympathetic to Black Americans.

Voir dire took place on September 15, 2020, less than four months after the murder of George Floyd at the hands of Minneapolis police that rocked the nation. During voir dire of the panel, which was at that time apparently all-white, the prosecutor asked,

> Is there anyone here who has either attended, spoke at, or otherwise supported a demonstration in support of Black Lives Matter? Is there anyone who's done that? Show of hands?

Two jurors raised their hands. A third juror later volunteered that they did not attend a rally but provided a donation for Black Lives Matter. It appears that two of these three jurors were ultimately stricken with peremptory challenges, but the record does not indicate which side struck them.

This case involved a Black defendant, but it wasn't a case with racial overtones, and it wasn't a case about police conduct. It was about a rape, convincingly described in detail by C.H.

Skilled attorneys typically ask two kinds of voir dire questions in addition to the customary, routine questions. One type of questioning involves "preselling" the case. For example, this prosecutor asked the panel, "Who deserves to be raped?" Surely the prosecutor didn't expect anyone to answer that somebody deserves to be raped. He was preselling his case.

The other type of questioning involves asking a simple *factual* question where a prospective juror can be expected to give an honest answer in order to get at the prospective juror's *underlying outlook and beliefs*. That's what I believe the prosecutor was doing here. He was asking prospective white jurors whether they had attended or supported a Black Lives Matter rally as a way of getting at their views on race. To put the matter in perspective, as of July 3, 2020, two months before this trial, it was estimated that fifteen to twenty-six million people had already participated in demonstrations over the death of George Floyd and others. Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

Many questions of the second type are unobjectionable. For example, it is perfectly fine to ask a prospective juror whether they use a shopping list at the supermarket or just walk the aisles. The lawyer doesn't really care about how

the juror shops but is trying to get at whether the juror is likely to take a systematic or an intuitive approach to the case. But not all second-type questions are so innocuous. One good way of testing the legitimacy of a second-type question is to consider how we would feel if the lawyer asked the direct version of the question, instead of the proxy version. For example, could the prosecutor have asked here, "Are you concerned about the status of Black Americans in this country?" I would find that quite troubling.

I echo the views of the Nevada Supreme Court in *Cooper v. State* where it criticized the state's use of a Black Lives Matter question during voir dire and specifically voiced concern about "questioning a veniremember's support for social justice movements with indisputable racial undertones." 432 P.3d 202, 206 (Nev. 2018). As the court put it,

> The question had, at best, minimal relevance to the circumstances of this case. The question did not examine an issue apparent in this case, and the State fails to credibly explain how this question helped expose whether a prospective juror could "consider and decide the facts impartially and conscientiously apply the law as charged by the court."

*Id.* (footnote omitted) (citation omitted) (quoting *Johnson v. State*, 148 P.3d 767, 774 (Nev. 2006) (en banc)).

The defendant here received a fair trial, and his trial counsel did not object at the time to the Black Lives Matter voir dire inquiry. But I do not believe this inquiry was proper. Again, this case had nothing to do with police conduct. What's next? In a case with a Mexican-American defendant, will the prosecutor be able to ask whether a prospective white juror supports higher levels of

immigration on our southern border? Our country is polarized enough without a voir dire process threatening to make it more so.

Christensen, C.J., and McDermott, J., join this concurrence.